**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **WILLIAM PRICE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SYSCO WEST COAST FLORIDA, INC.,**<br><br>**Defendant** | **Case No.: 8:26-cv-2513** |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff, WILLIAM PRICE ("Plaintiff" or "Price"), by and through undersigned counsel, sues Defendant, SYSCO WEST COAST FLORIDA, INC. ("Defendant" or "Sysco"), and alleges as follows:

I. <u>NATURE OF THE ACTION</u>

1. This is an employment-discrimination and retaliation action arising from Defendant's discriminatory denial of promotions, transfers, and advancement opportunities; disparate treatment and selective enforcement of workplace policies; discriminatory termination; retaliation for Plaintiff's opposition to race discrimination; and retaliation for Plaintiff's objections to and refusal to participate in workplace practices that violated federal workplace-safety regulations.

## II. PARTIES

2. Plaintiff William Price is an adult natural person and resident of Hillsborough County, Florida.

3. Plaintiff is Black and is a member of a protected class under Title VII and the Florida Civil Rights Act.

4. Plaintiff was qualified for his position and for one or more promotions, transfers, reassignments, or advancement opportunities for which he applied.

5. Defendant Sysco West Coast Florida, Inc. is a foreign profit corporation authorized to conduct business in Florida.

6. Defendant is an "employer" within the meaning of Title VII because it employed at least fifteen employees during each of twenty or more calendar weeks in the relevant current or preceding calendar year.

7. Defendant is an "employer" within the meaning of the Florida Civil Rights Act because it employed fifteen or more employees during the relevant period.

8. Defendant is an "employer" within the meaning of the Florida Private-Sector Whistleblower Act.

9. Plaintiff was Defendant's "employee" within the meaning of the Florida Private-Sector Whistleblower Act.

10. At all relevant times, Defendant acted through its officers, directors, managers, supervisors, human resources personnel, employees, and other agents.

11. Defendant's managers, supervisors, and human-resources personnel acted within the course and scope of their employment or agency when participating in or influencing the employment decisions challenged in this action.

12. Defendant authorized, ratified, approved, or failed to remedy the unlawful conduct alleged in this Complaint.

## III. <u>JURISDICTION</u>

13. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under Title VII, 42 U.S.C. §§ 2000e through 2000e-17.

14. This Court has jurisdiction under 28 U.S.C. § 1343 because Plaintiff seeks relief for the deprivation of rights secured by federal civil-rights law.

15. This Court has supplemental jurisdiction over Plaintiff's claims under the Florida Civil Rights Act and Florida Private-Sector Whistleblower Act pursuant to 28 U.S.C. § 1367.

16. Plaintiff's state law claims arise from the same employment relationship, employment practices, disciplinary decisions, termination, and operative facts as Plaintiff's Title VII claims.

17. Plaintiff seeks declaratory, injunctive, equitable, and monetary relief under Title VII, including the relief authorized by 42 U.S.C. §§ 2000e-5(g) and 1981a.

18. Plaintiff seeks relief under the Florida Civil Rights Act, including Fla. Stat. §§ 760.07, 760.10, and 760.11.

19. Plaintiff seeks relief under the Florida Private-Sector Whistleblower Act, Fla. Stat. §§ 448.101 through 448.105.

## IV. VENUE

20. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

21. Defendant employed Plaintiff at its facility in Palmetto, Manatee County, Florida.

22. The unlawful employment practices alleged in this Complaint occurred in Manatee County, Florida, within the Middle District of Florida.

23. Defendant conducts substantial business within the Middle District of Florida and maintains a place of business in Palmetto, Florida.

24. The employment records relevant to Plaintiff's claims are maintained or administered within this District or concern employment practices occurring within this District.

25. But for Defendant's unlawful employment practices, Plaintiff would have continued working for Defendant within the Middle District of Florida.

26. Assignment to the Tampa Division is appropriate because the events giving rise to this action occurred in Manatee County, Florida.

## V. ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

27. Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on May 26, 2026, Charge No. 511-2026-00519, naming Defendant as the respondent. (Exhibit 1)

28. Plaintiff filed the Charge with both the EEOC and the Florida Commission on Human Relations ("FCHR"), pursuant to a work sharing agreement.

29. The Charge alleged race discrimination, discriminatory denial of advancement opportunities, disparate treatment, selective enforcement of Defendant's employment policies, retaliation, and discriminatory or retaliatory termination.

30. Plaintiff's filing with the EEOC and FCHR satisfied the administrative-filing requirements of Title VII and the Florida Civil Rights Act, as Plaintiff's claims in this action were expressly included in the Charge or are reasonably related to, amplify, clarify, or could reasonably be expected to grow out of the allegations and administrative investigation of the Charge.

31. The EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on June 2, 2026. (Exhibit 2)

32. Plaintiff commenced this action within ninety days after receiving the Notice of Right to Sue.

33. Plaintiff has satisfied all conditions precedent to filing this action. Alternatively, all conditions precedent have occurred, have been performed, or have been waived.

## VI. GENERAL FACTUAL ALLEGATIONS

### A. Plaintiff's employment and performance

34. Defendant hired Plaintiff in approximately December 2020, initially as an overnight Order Selector in its warehouse distribution operation.

35. The Order Selector position was a physically demanding, high-turnover hourly position involving overnight shifts that frequently lasted between ten and fourteen hours and routinely walking approximately

30,000 steps per shift while manually selecting and stacking more than 2,000 cases of product.

36. Plaintiff performed his duties in multiple warehouse environments, including dry-storage, cooler, and freezer departments.

37. Order Selector compensation was heavily incentive based. Although Order Selectors received a base hourly rate, substantially greater earnings depended upon maintaining production percentages above Defendant's thresholds. Bonus compensation also depended on maintaining low error rates while satisfying Defendant's productivity requirements.

38. Warehouse employees were subject to stricter attendance, productivity, and disciplinary requirements than many salaried, office, and daytime employees at the same facility.

39. Plaintiff consistently performed at a high level, regularly achieving productivity percentages substantially above Defendant's minimum requirements.

40. Plaintiff had no material history of attendance problems or disciplinary violations before the events leading to his termination.

41. Plaintiff was selected for and promoted to a Team Lead position, which was an hourly leadership role involving operational support and employee guidance.

42. Plaintiff accepted the Team Lead role partly to acquire leadership experience and improve his prospects for advancement.

43. Defendant subsequently eliminated Plaintiff's Team Lead position without providing Plaintiff a meaningful explanation or comparable advancement opportunity.

44. Plaintiff holds a degree in mechanical engineering.

45. Plaintiff also completed additional information-technology training and certifications while employed by Defendant, and undertook the additional training to qualify for operational, corporate, engineering, technical, information technology, and remote positions within the company.

B. <u>Defendant's denial of promotions and advancement opportunities</u>

46. Throughout his employment, Plaintiff repeatedly sought promotions, transfers, reassignments, and other internal advancement opportunities, applying for eight to ten internal positions.

47. The positions included operational, corporate, technical, engineering-related, information-technology, and remote positions.

48. Plaintiff satisfied the stated qualifications of each position he applied for.

49. Defendant rejected Plaintiff, declined to interview him, failed to forward his application for meaningful consideration, or otherwise denied him the positions.

50. Upon information and belief, Defendant selected an individual for the positions who were outside Plaintiff's protected class, for the positions.

51. Plaintiff will supplement the allegations concerning the remaining positions after obtaining Defendant's internal job posting, application, interview, selection, and personnel records through discovery.

52. At all relevant times, Plaintiff possessed a degree in mechanical engineering.

53. Plaintiff also possessed nearly five years of warehouse and distribution experience with Defendant and experience performing at high productivity levels in multiple warehouse departments.

54. Plaintiff had been selected for and had performed Team Lead responsibilities and completed additional information technology training and certifications while employed by Defendant.

55. Plaintiff possessed the education, experience, performance record, leadership background, and technical training necessary to qualify for one or more of the positions for which he applied.

56. Despite Plaintiff's qualifications, Defendant repeatedly rejected him, failed to interview him, failed to forward his application for meaningful consideration, or failed to respond to his applications.

57. Defendant screened internal candidates through their direct supervisors and facility management before allowing them to advance in the internal hiring process.

58. Plaintiff's direct supervisor, John Tiel, informed Plaintiff that Defendant considered him to be in "bad standing" because of warehouse-performance error metrics.

59. Defendant's purported "good standing" requirement operated particularly harshly against Order Selectors, who were subject to uniquely strict productivity, error, attendance, incentive-compensation, and disciplinary systems.

60. Defendant's error metrics could eliminate incentive pay, result in disciplinary write-ups, place an employee in "bad standing," and prevent the employee from being considered for advancement.

61. Defendant used those warehouse metrics to deny Plaintiff access to positions that did not necessarily involve warehouse-selection productivity standards.

62. Plaintiff regularly exceeded Defendant's production requirements and had a strong overall performance, attendance, and disciplinary record; Defendant nevertheless used selected warehouse error metrics to prevent Plaintiff from receiving promotions, transfers, and other advancement opportunities.

63. Defendant also denied Plaintiff a transfer to Defendant's Tampa facility based on his purported "bad standing," while not applying the same rigid standards to non-Black employees who sought transfers, reassignments, or alternative positions.

64. Plaintiff observed white employees who reportedly struggled to meet warehouse productivity requirements receive extended retention periods, transfers, reassignments, or alternative employment opportunities instead of progressive discipline or termination. Those employees were transferred or reassigned to office-support, forklift, loading, transportation-related, and other non-performance positions.

65. Defendant did not provide Plaintiff comparable opportunities despite his education, training, performance, seniority, and leadership experience.

66. Upon information and belief, Defendant permitted one or more non-Black employees with comparable or inferior qualifications to advance

to positions for which Plaintiff applied or to comparable positions that were not openly posted.

67. Black Order Selectors remained subject to Defendant's stricter warehouse productivity and disciplinary systems and received fewer opportunities to transfer out of those positions.

68. Defendant's denial of promotions, transfers, reassignments, and advancement opportunities adversely affected Plaintiff's compensation, benefits, career development, and long-term employment prospects.

C. <u>Plaintiff's opposition to unequal and discriminatory treatment</u>

69. Plaintiff regularly questioned supervisors and managers regarding the fairness and inconsistent administration of Defendant's productivity, error, compensation, disciplinary, transfer, and advancement systems.

70. Plaintiff communicated that warehouse employees, including Black Order Selectors, were being held to substantially harsher standards than employees in other departments, and questioned why non-Black employees who struggled with warehouse performance requirements received transfers, reassignments, office positions, forklift positions, loading positions, transportation positions, or other alternatives to discipline or termination.

71. Plaintiff questioned why he and other Black warehouse employees remained subject to Defendant's stricter productivity and disciplinary standards without comparable opportunities.

72. Plaintiff opposed what he reasonably and in good faith believed to be race discrimination and unequal treatment in the administration of Defendant's workplace policies, and communicated his complaints and objections to Defendant's supervisors or managers, who were thus aware of Plaintiff's complaints and objections.

73. Defendant did not investigate or remedy the unequal treatment identified by Plaintiff, but instead continued to deny Plaintiff promotions, transfers, reassignments, and advancement opportunities, and subjected Plaintiff's conduct to heightened or selective scrutiny.

D. Defendant's forklift practices and violations of federal workplace safety regulations

74. During his employment, Plaintiff observed Defendant assign employees to operate or perform duties involving forklifts and other powered industrial trucks when those employees had not completed the required training or had not been evaluated and certified as competent operators.

75. Forklifts and similar warehouse vehicles used by Defendant constitute powered industrial trucks subject to federal workplace safety regulations.

76. Under 29 C.F.R. § 1910.178(l)(1)(i), an employer must ensure that each powered-industrial-truck operator is competent to operate the equipment safely, as demonstrated by successful completion of the training and evaluation required by the regulation.

77. Under 29 C.F.R. § 1910.178(l)(1)(ii), an employer must ensure, before permitting an employee to operate a powered industrial truck, that the employee has successfully completed the required training, except under the regulation's limited conditions for training.

78. Under 29 C.F.R. § 1910.178(l)(2)(i), an employee receiving training may operate a powered industrial truck only under the direct supervision of a person qualified to train operators and evaluate their competence and only where the operation does not endanger the trainee or other employees.

79. Under 29 C.F.R. § 1910.178(l)(6), the employer must certify that each operator has been trained and evaluated, including the operator's name, the dates of training and evaluation, and the identity of the persons performing the training or evaluation.

80. Defendant permitted or directed employees to operate or perform duties involving powered industrial trucks without ensuring that

they had completed the training, evaluation, supervision, or certification required by 29 C.F.R. § 1910.178(l).

81. Defendant's supervisors asked Plaintiff to operate or assist with forklift related duties even though Plaintiff did not believe he had completed the training, evaluation, or certification necessary for the requested assignment.

82. Plaintiff informed Defendant's supervisors that he did not believe he was properly trained or certified for the requested forklift work.

83. Plaintiff objected to Defendant's practice of assigning him or other employees to operate or perform duties involving forklifts without the required training, evaluation, or certification.

84. On at least one occasion, Plaintiff refused a supervisor's direction that he perform forklift related work because he was not properly trained, evaluated, or certified to perform that work safely.

85. Plaintiff's objection and refusal concerned Defendant's noncompliance with the powered industrial truck training and certification requirements of 29 C.F.R. § 1910.178(l).

86. Plaintiff also objected because removing him from Order Selector work impaired his production percentages, error coverage, and eligibility for incentive based compensation.

87. Defendant knew that Plaintiff had objected to and refused to participate in the forklift related practices.

88. Plaintiff continued to question and object to Defendant's forklift practices, workplace safety conditions, and operational inconsistencies.

E. The overturned-forklift video

89. In September 2025, Plaintiff observed an overturned forklift inside Defendant's warehouse, which was an actual workplace safety incident.

90. The incident was consistent with and related to the forklift practices and workplace safety concerns Plaintiff had previously raised.

91. Plaintiff recorded the overturned forklift using prescription smart glasses that he wore as his ordinary corrective eyewear; Plaintiff was not actively operating a handheld cellular telephone when he recorded the footage.

92. Before publicly posting the footage, Plaintiff showed it to Paul Roberts, Defendant's Operations Manager or Director of Warehouse Operations.

93. Paul Roberts responded with words to the effect of, "as long as it doesn't make us look bad."

94. Paul Roberts did not tell Plaintiff that recording or posting the footage violated Defendant's social media policy or instruct Plaintiff at any time not to post the footage.

95. Plaintiff subsequently posted the footage in connection with a public Facebook group used by warehouse employees and Order Selectors to discuss working conditions, which maintained discussions regarding warehouse conditions, workload, productivity expectations, incentive systems, workplace safety, and differences among Sysco warehouse operations.

96. Although the video included humorous or satirical elements, it documented an actual overturned forklift and workplace safety incident.

97. The video did not identify individual employees, intentionally disclose confidential business information or prominently display Defendant's logo.

F. <u>Defendant's meeting with Plaintiff and termination decision</u>

98. Shortly after the video was posted, Defendant summoned Plaintiff to a conference-room meeting following a warehouse startup meeting.

99. Heidi Arias[1] and Kevin Farren were present, as was Paul Roberts for at least part of the relevant discussion.

100. Arias asked Plaintiff whether he had posted a video depicting an overturned forklift inside Defendant's warehouse, to which Plaintiff acknowledged posting the video.

101. Farren questioned why Plaintiff had posted the video and raised the possibility of someone being injured, to which Plaintiff explained that the overturned forklift was an unusual workplace event and an actual safety incident.

102. Plaintiff further explained that individuals commonly document unusual incidents, accidents, or unexpected events, and explained his understanding that the video did not identify employees, display Defendant's logo, or reveal confidential operational information.

103. Management questioned whether Plaintiff had committed a safety infraction by recording the video, to which Plaintiff explained that he recorded the video through his prescription smart glasses and was not actively operating a handheld device.

---

[1] the Plaintiff mistakenly referred to Ms. Arias as "Heidi Harris" in his Charge of Discrimination.

104. During the meeting, Farren stated words to the effect of, "What if OSHA saw it?" demonstrating that Defendant understood the footage could expose Defendant's workplace-safety practices to OSHA or the public.

105. Farren also stated words to the effect of, "We don't pay you to post. We pay you to select."

106. Defendant's management focused upon the visibility of the incident and the possibility that OSHA could learn of it rather than investigating and correcting the underlying workplace-safety condition.

107. Defendant did not meaningfully investigate the forklift incident, Plaintiff's prior safety concerns, the training, evaluation, or certification of the employee operating the overturned forklift, or the circumstances that caused the forklift to overturn.

108. Defendant did not give Plaintiff a warning, progressive discipline, or an opportunity to remove or further explain the post.

109. On or about September 25, 2025, approximately two days after the posting, Defendant terminated Plaintiff's employment.

110. Arias communicated the termination to Plaintiff and referenced a cease-and-desist instruction concerning the video.

111. Defendant terminated Plaintiff despite his nearly five years of service, high productivity, strong attendance, leadership experience, and lack of a material disciplinary record.

112. The close temporal relationship between Plaintiff's safety-related post and his termination supports an inference that Defendant terminated him because his conduct exposed or risked exposing Defendant's workplace-safety practices and violations.

113. Farren's statement, "What if OSHA saw it?" constitutes direct or circumstantial evidence that Plaintiff's protected safety objections and the risk of governmental scrutiny influenced Defendant's decision.

114. Plaintiff's earlier objections to and refusal to participate in Defendant's forklift practices, together with his subsequent documentation of an overturned forklift, were causes of Defendant's decision to terminate him.

G. <u>Selective enforcement of Defendant's social media and workplace policies</u>

115. Defendant stated or suggested that Plaintiff had violated a social media, safety, recording, confidentiality, or related workplace policy, but did not state the particular policy provision he allegedly violated during the termination meeting.

116. Defendant did not conduct a meaningful investigation into the content, context, audience, or safety-related purpose of Plaintiff's post.

117. After his termination, Plaintiff learned that other employees had created or posted workplace related social media content without receiving comparable discipline.

118. One such comparator was Arias, who worked as a Human Resources Representative in or in connection with Defendant's human-resources department.

119. Arias is White and is outside Plaintiff's protected class.

120. On or about November 8, 2025, Arias posted a TikTok video that appeared to have been recorded inside Defendant's workplace.

121. The TikTok video used Defendant's workplace imagery, office setting, equipment, identifying information, or other workplace related content as part of a social media template or trend.

122. The TikTok post was materially similar to Plaintiff's post for purposes of Defendant's asserted prohibition against recording or posting content from inside the workplace.

123. Alternatively, the TikTok post implicated the same or similar social media, workplace recording, confidentiality, safety, or employee conduct policies that Defendant claimed Plaintiff violated.

124. Defendant knew or reasonably should have known about the TikTok post because the video was posted to Arias's personal social media account, which was followed by coworkers and managers employed at Defendant's facility.

125. Defendant did not terminate Arias for creating or posting workplace related content.

126. Upon information and belief, Defendant did not meaningfully investigate or discipline Arias.

127. Plaintiff also observed or learned of other employees who posted videos, photographs, or other social media content from Defendant's warehouse, offices, or breakrooms without being terminated, who were not members of Plaintiff's protected class.

128. Plaintiff will supplement the allegations concerning the remaining comparators through discovery.

129. The other employees engaged in materially similar workplace related social media activity but were not subjected to the same scrutiny, investigation, discipline, cease and desist instruction, or termination imposed upon Plaintiff.

130. Defendant applied its social media and workplace recording policy and disciplinary policies more harshly to Plaintiff than to employees outside Plaintiff's protected class.

131. Defendant's asserted policy justification was inconsistent with Paul Roberts's prior review of the video and failure to identify any policy violation.

132. Defendant's asserted justification was also inconsistent with Defendant's tolerance of workplace related social media content posted by other employees.

133. The circumstances surrounding Defendant's selective enforcement support a reasonable inference that Defendant's stated reason for terminating Plaintiff was not the actual reason for its decision.

134. Defendant's stated reason was false, inconsistently applied, insufficient to motivate the termination, or otherwise pretextual.

135. Plaintiff's race was a motivating factor in Defendant's selective enforcement of its policies and termination of Plaintiff.

136. Plaintiff's opposition to race discrimination and unequal treatment was also a but-for cause of one or more of Defendant's adverse employment actions.

137. Plaintiff's objections to and refusal to participate in Defendant's unlawful forklift practices were also causes of Defendant's termination decision.

H. Plaintiff's damages

138. Before his termination, Plaintiff earned approximately $110,000 to $120,000 annually through wages, overtime, incentive compensation, and other remuneration.

139. Plaintiff made substantial retirement contributions, including contributions of approximately twenty-four percent of his income to his 401(k).

140. Plaintiff was also repaying an approximately $30,000 401(k) loan through payroll deductions.

141. The termination caused Plaintiff to lose wages, overtime, incentive compensation, bonuses, retirement contributions, health insurance benefits, vacation benefits, seniority, and other employment benefits.

142. Plaintiff was approaching his fifth anniversary with Defendant, which would have provided additional vacation benefits and increased employment stability.

143. Following his termination, Plaintiff attempted to pursue unemployment benefits but experienced difficulty accessing or completing the process. Despite his mitigation efforts, Plaintiff has struggled to obtain comparable employment.

144. Defendant's discriminatory denial of advancement opportunities impaired Plaintiff's ability to acquire practical experience in technical, engineering, corporate, or information-technology positions.

145. Plaintiff's termination disrupted his intended transition to a more sustainable technical, engineering, corporate, or remote position.

146. The loss of Plaintiff's position and employment benefits disrupted his financial and retirement planning.

147. Defendant's conduct caused Plaintiff emotional distress, embarrassment, humiliation, stress, anxiety, and sleep disruption.

148. Defendant's conduct caused Plaintiff ongoing anxiety regarding future employment opportunities, career prospects, financial security, and long term physical health.

149. Plaintiff also became concerned about continuing to develop personal social media or business-related content following Defendant's cease and desist instruction.

150. Plaintiff has suffered and continues to suffer economic and noneconomic damages as a direct and proximate result of Defendant's unlawful conduct.

**COUNT I**
TITLE VII—RACE DISCRIMINATION: FAILURE TO PROMOTE

151. Plaintiff realleges paragraphs 2 – 7, 27 – 33, 34, 39 – 45, 46 – 68, and 138 – 150 as if fully set forth in this Count.

152. Defendant was Plaintiff's employer within the meaning of Title VII.

153. Plaintiff is Black and is a member of a protected class.

154. Plaintiff was qualified for one or more promotions, transfers, reassignments, or advancement opportunities based on his education, experience, productivity, training, and leadership responsibilities.

155. Plaintiff applied for the positions identified in paragraph 46 and other internal positions.

156. Defendant denied Plaintiff the opportunities, declined to interview or consider him meaningfully, failed to forward his applications, or failed to respond to his applications.

157. Defendant used warehouse-performance and "good standing" standards to block Plaintiff's advancement despite his strong overall performance.

158. Defendant afforded white employees greater access to transfers, office positions, forklift positions, loading positions, transportation positions, and other alternatives to continued warehouse-selection work.

159. Defendant permitted one or more white employees with comparable or inferior qualifications to receive transfers, reassignments, promotions, or advancement opportunities that were denied to Plaintiff.

160. Defendant's treatment of Plaintiff was less favorable than its treatment of similarly situated employees outside Plaintiff's protected class.

161. Defendant's stated reasons for denying Plaintiff advancement were false, inconsistently applied, insufficient, or otherwise pretextual.

162. Plaintiff's race was a motivating factor in Defendant's failure to promote, transfer, reassign, or advance him.

163. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, benefits, advancement opportunities, career opportunities, emotional distress, and other damages.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

**COUNT II**

TITLE VII—RACE DISCRIMINATION: DISPARATE TREATMENT, SELECTIVE DISCIPLINE, AND TERMINATION

164. Plaintiff realleges paragraphs 2 – 7, 27 – 33, 34, 39 – 45, 89 – 116, 117 – 135, and 138 – 150 as if fully set forth in this Count.

165. Defendant was Plaintiff's employer within the meaning of Title VII.

166. Plaintiff is Black and is a member of a protected class.

167. Plaintiff was qualified for his position.

168. Plaintiff had a history of high productivity, strong attendance, leadership service, and no material progressive discipline history.

169. Defendant subjected Plaintiff to disparate treatment by selectively scrutinizing his conduct and enforcing its social media, recording, safety, confidentiality, or workplace policies more harshly against him, and ultimately, terminating his employment.

170. Defendant asserted that Plaintiff violated a social media, recording, safety, confidentiality, or related workplace policy, but failed to conduct a meaningful investigation or identify for Plaintiff the particular policy provision allegedly violated.

171. Defendant did not terminate one or more employees outside Plaintiff's protected class who created or posted workplace related social media content.

172. The employees outside Plaintiff's protected class were treated more favorably despite engaging in materially similar conduct, resulting in selective enforcement of its policies against Plaintiff.

173. Defendant's asserted justification was inconsistent with Paul Roberts's prior review of the video and failure to identify any policy violation and with its tolerance of workplace related social media activity by other employees.

174. Defendant's stated reason for Plaintiff's termination was false, insufficient, inconsistently applied, or otherwise pretextual.

175. Plaintiff's race was a motivating factor in Defendant's disparate treatment, selective discipline, and termination of Plaintiff.

176. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff sustained the damages alleged above.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

## COUNT III
## TITLE VII—RETALIATION FOR OPPOSING RACE DISCRIMINATION

177. Plaintiff realleges paragraphs 2 – 7, 27 – 33, 46 – 73, 98 – 116, 117 – 136, and 138 – 150 as if fully set forth in this Count.

178. Plaintiff opposed what he reasonably and in good faith believed to be race discrimination and unequal employment practices prohibited by Title VII.

179. Plaintiff questioned why Black Order Selectors were held to stricter productivity, disciplinary, transfer, and advancement standards

while white employees received reassignments, transfers, and alternative placement opportunities.

180. Plaintiff questioned why white employees received opportunities to transfer into office, forklift, loading, transportation, and other positions that were not made comparably available to Plaintiff and other Black warehouse employees.

181. Plaintiff communicated his concerns to Defendant's supervisors or managers.

182. Plaintiff's complaints and objections constituted activity protected by Title VII.

183. Defendant knew of Plaintiff's protected opposition.

184. After learning of Plaintiff's protected opposition, Defendant continued to deny him promotion, transfer, reassignment, and advancement opportunities, and subjected Plaintiff's conduct to heightened or selective scrutiny.

185. Defendant denied Plaintiff the benefit of a meaningful investigation or progressive discipline and terminated Plaintiff.

186. There was a causal relationship between Plaintiff's protected opposition and one or more of Defendant's adverse employment actions.

187. But for Plaintiff's protected opposition, Defendant would not have taken one or more of the adverse employment actions alleged in this Count.

188. Defendant's asserted reasons for its actions were false, insufficient, inconsistently applied, or otherwise pretextual.

189. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered the damages alleged above.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

## COUNT IV
## FLORIDA CIVIL RIGHTS ACT—RACE DISCRIMINATION: FAILURE TO PROMOTE

190. Plaintiff realleges paragraphs 2 – 7, 27 – 33, 34, 39 – 45, 46 – 68, and 138 – 150 as if fully set forth in this Count.

191. Defendant was Plaintiff's employer within the meaning of the Florida Civil Rights Act.

192. Plaintiff is Black and is a member of a class protected by the Florida Civil Rights Act.

193. Plaintiff was qualified for one or more promotions, transfers, reassignments, or advancement opportunities based on his education, experience, productivity, training, and leadership responsibilities.

194. Plaintiff applied for the positions identified in paragraph 46 and other internal positions.

195. Defendant denied Plaintiff the opportunities, declined to interview or consider him meaningfully, failed to forward his applications, or failed to respond to his applications.

196. Defendant used warehouse-performance and "good standing" standards to block Plaintiff's advancement despite his strong overall performance.

197. Defendant afforded white employees greater access to transfers, office positions, forklift positions, loading positions, transportation positions, and other alternatives to continued warehouse-selection work, and permitted one or more white employees with comparable or inferior qualifications to receive transfers, reassignments, promotions, or advancement opportunities that were denied to Plaintiff.

198. Defendant's treatment of Plaintiff was less favorable than its treatment of similarly situated employees outside Plaintiff's protected class.

199. Defendant's stated reasons for denying Plaintiff advancement were false, inconsistently applied, insufficient, or otherwise pretextual.

200. Plaintiff's race was a motivating factor in Defendant's failure to promote, transfer, reassign, or advance him.

201. Defendant thereby violated Fla. Stat. § 760.10.

202. As a direct and proximate result, Plaintiff suffered the damages alleged above.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

## COUNT V
## FLORIDA CIVIL RIGHTS ACT—RACE DISCRIMINATION: DISPARATE TREATMENT, SELECTIVE DISCIPLINE, AND TERMINATION

203. Plaintiff realleges paragraphs few – 7, 27 – 33, 34, 89 – 45, 89 – 116, 117 – 135, and 138 – 150 as if fully set forth in this Count.

204. Defendant was Plaintiff's employer within the meaning of the Florida Civil Rights Act.

205. Plaintiff is Black and is a member of a protected class.

206. Plaintiff was qualified for his position.

207. Plaintiff had a history of high productivity, strong attendance, leadership service, and no material progressive discipline history.

208. Defendant subjected Plaintiff to disparate treatment by selectively scrutinizing his conduct and enforcing its social media, recording, safety, confidentiality, or workplace policies more harshly against him, and subjected Plaintiff to an adverse employment action by terminating him.

209. Defendant asserted that Plaintiff violated a social media, recording, safety, confidentiality, or related workplace policy, but did not conduct a meaningful investigation or identify for Plaintiff the particular policy provision allegedly violated.

210. Defendant did not terminate one or more employees outside Plaintiff's protected class who created or posted workplace related social media content, thus, the employees outside Plaintiff's protected class were treated more favorably despite engaging in materially similar conduct.

211. Defendant selectively enforced its policies against Plaintiff.

212. Defendant's asserted justification was inconsistent with Paul Roberts's prior review of the video and failure to identify any policy violation and Defendant's tolerance of workplace related social media activity by other employees.

213. Defendant's stated reason for Plaintiff's termination was false, insufficient, inconsistently applied, or otherwise pretextual.

214. Plaintiff's race was a motivating factor in Defendant's disparate treatment, selective discipline, and termination of Plaintiff.

215. Defendant thereby violated Fla. Stat. § 760.10.

216. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff sustained the damages alleged above.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

## COUNT VI
## FLORIDA CIVIL RIGHTS ACT— RETALIATION FOR OPPOSING RACE DISCRIMINATION

217. Plaintiff realleges paragraphs 2 – 7, 27 – 33, 46 – 73, 98 – 116, 117 – 136, and 138 – 150 as if fully set forth in this Count.

218. Defendant was Plaintiff's employer within the meaning of the Florida Civil Rights Act.

219. Plaintiff opposed what he reasonably and in good faith believed to be race discrimination and unequal employment practices prohibited by the Florida Civil Rights Act.

220. Plaintiff questioned why Black Order Selectors were held to stricter productivity, disciplinary, transfer, and advancement standards while white employees received reassignments, transfers, and alternative-placement opportunities.

221. Plaintiff questioned why white employees received opportunities to transfer into office, forklift, loading, transportation, and other positions that were not made comparably available to Plaintiff and other Black warehouse employees.

222. Plaintiff communicated his concerns to Defendant's supervisors or managers.

223. Plaintiff's complaints and objections constituted protected activity under the Florida Civil Rights Act.

224. Defendant knew of Plaintiff's protected opposition.

225. After learning of Plaintiff's protected opposition, Defendant continued to deny him promotion, transfer, reassignment, and advancement opportunities and subjected Plaintiff's conduct to heightened or selective scrutiny.

226. Defendant denied Plaintiff the benefit of a meaningful investigation or progressive discipline, and terminated Plaintiff.

227. There was a causal relationship between Plaintiff's protected opposition and one or more of Defendant's adverse employment actions.

228. But for Plaintiff's protected opposition, Defendant would not have taken one or more of the adverse employment actions alleged in this Count.

229. Defendant's asserted reasons for its actions were false, insufficient, inconsistently applied, or otherwise pretextual.

230. Defendant thereby violated the anti-retaliation provisions of Fla. Stat. § 760.10.

231. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered the damages alleged above.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

**COUNT VII**
FLORIDA PRIVATE-SECTOR WHISTLEBLOWER ACT

232. Plaintiff realleges paragraphs 2, 5, 8 – 12, 74 – 97, 98 – 116, 117 – 137, and 138 – 150 as if fully set forth in this Count.

233. This Count arises exclusively under Florida's Private-Sector Whistleblower Act, Fla. Stat. §§ 448.101 through 448.105.

234. The OSHA regulations identified in this Count constitute the underlying "law, rule, or regulation" violated by Defendant's activity, policy, or practice for purposes of Fla. Stat. § 448.102(3).

235. Defendant was an "employer," and Plaintiff was an "employee," within the meaning of Fla. Stat. § 448.101.

236. Defendant maintained, implemented, or permitted an activity, policy, or practice of assigning or allowing employees to operate or perform duties involving powered industrial trucks without first ensuring that they had completed the training and evaluation required by 29 C.F.R. § 1910.178(l).

237. Defendant failed to ensure that each employee assigned to operate a powered industrial truck was competent to operate the equipment safely, as required by 29 C.F.R. § 1910.178(l)(1)(i).

238. Defendant assigned or permitted employees to operate powered industrial trucks without first ensuring that the employees had successfully completed the required training, contrary to 29 C.F.R. § 1910.178(l)(1)(ii).

239. To the extent Defendant permitted untrained employees to operate powered industrial trucks as trainees, Defendant failed to ensure that the operation occurred under the required direct supervision and conditions that did not endanger the trainees or other employees, contrary to 29 C.F.R. § 1910.178(l)(2)(i).

240. Defendant failed to ensure or maintain the required certification that each operator had been trained and evaluated, as required by 29 C.F.R. § 1910.178(l)(6).

241. Specifically, Defendant directed or attempted to direct Plaintiff to operate or perform duties involving a forklift even though Plaintiff had not completed the required training, evaluation, or certification.

242. Defendant's activity, policy, or practice violated 29 C.F.R. § 1910.178(l).

243. Plaintiff objected to Defendant's unlawful activity, policy, or practice.

244. Plaintiff informed Defendant's supervisors that he was not properly trained or certified to perform the requested forklift related duties.

245. Plaintiff refused to participate in Defendant's unlawful activity, policy, or practice by declining to perform forklift related work without the required training, evaluation, or certification.

246. Plaintiff's objections and refusal constituted protected activity under Fla. Stat. § 448.102(3).

247. Defendant knew of Plaintiff's objections and refusal.

248. Plaintiff subsequently documented an overturned forklift inside Defendant's warehouse.

249. The overturned forklift was an actual workplace safety incident connected to the general category of forklift practices to which Plaintiff had previously objected.

250. Before posting the footage, Plaintiff showed it to Paul Roberts, who did not inform Plaintiff that posting it would violate Defendant's policies.

251. Plaintiff posted the video in the context of discussions among warehouse workers concerning working conditions and workplace safety.

252. After the video was posted, Defendant summoned Plaintiff to a meeting and questioned him concerning the post.

253. During the meeting, Kevin Farren stated, “What if OSHA saw it?” or words to that effect.

254. Kevin Farren’s statement demonstrated that Defendant understood the footage could expose Defendant’s workplace safety practices and violations to governmental scrutiny.

255. Defendant’s management focused on the possibility that OSHA or the public could see the video rather than meaningfully investigating and correcting the workplace-safety condition documented in the video.

256. Defendant did not meaningfully investigate the overturned forklift incident, the training or certification of the relevant operator, Plaintiff’s prior safety objections, or the circumstances that caused the forklift to overturn.

257. Approximately two days after Plaintiff posted the overturned forklift footage, Defendant terminated Plaintiff’s employment.

258. Termination constitutes a retaliatory personnel action under the Florida Private-Sector Whistleblower Act.

259. Defendant asserted that Plaintiff violated a social media, recording, safety, confidentiality, or related workplace policy, but failed to identify the particular policy provision he allegedly violated.

260. Defendant did not conduct a meaningful investigation before terminating Plaintiff.

261. Defendant did not terminate other employees who posted workplace related content but whose content did not expose or highlight an actual workplace safety incident.

262. Defendant's asserted social media or workplace policy justification was selectively enforced, insufficient, false, or otherwise pretextual.

263. Plaintiff's objection to and refusal to participate in Defendant's violations of 29 C.F.R. § 1910.178(l) were causes of Defendant's decision to terminate him.

264. Plaintiff's documentation of the overturned forklift, Defendant's concern that OSHA might see the video, the timing of the termination, and Defendant's selective enforcement of its policies further demonstrate the causal connection between Plaintiff's protected conduct and the termination.

265. Defendant took retaliatory personnel action against Plaintiff because he objected to and refused to participate in Defendant's activity, policy, or practice that violated a law, rule, or regulation.

266. Defendant thereby violated Fla. Stat. § 448.102(3).

267. Plaintiff discovered Defendant's retaliatory personnel action when Defendant terminated him on or about September 25, 2025.

268. Plaintiff timely commenced this action within the limitations period established by Fla. Stat. § 448.103(1).

269. As a direct and proximate result of Defendant's violation, Plaintiff suffered lost wages, overtime, incentive compensation, benefits, retirement contributions, seniority, emotional distress, and other compensatory damages.

WHEREFORE, Plaintiff requests the relief set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant and award the following relief:

A. A declaration that Defendant violated Title VII, the Florida Civil Rights Act, and the Florida Private-Sector Whistleblower Act;

B. An injunction prohibiting Defendant from engaging in further discrimination or retaliation against Plaintiff;

C. Reinstatement to Plaintiff's former position or placement into an appropriate comparable position, or, alternatively, an award of front pay in lieu of reinstatement;

D. Back pay, including lost base wages, overtime, incentive compensation, bonuses, and other remuneration;

E. Lost employment benefits, including health-insurance benefits, retirement contributions, vacation benefits, seniority, and other fringe benefits;

F. Compensation for adverse tax consequences associated with a lump-sum back-pay or front-pay award, to the extent permitted by law;

G. Prejudgment and post-judgment interest;

H. Compensatory damages for emotional pain, suffering, inconvenience, humiliation, embarrassment, mental anguish, loss of dignity, loss of enjoyment of life, and other noneconomic injuries;

I. Punitive damages under Title VII and the Florida Civil Rights Act in the amounts permitted by law;

J. Reasonable attorney's fees;

K. Taxable costs and litigation expenses to the extent permitted by law;

L. The injunctive, reinstatement, fringe-benefit, seniority, lost-remuneration, and other compensatory relief authorized by Fla. Stat. § 448.103; and

M. All other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 27, 2026

MIHOK LAW
1401 East 22nd Avenue
Tampa, Florida 33605
(813) 248-6400
melissa@mihoklaw.us
Secondary: jordan@mihoklaw.us

Attorney for Plaintiff



____________________________
Melissa C. Mihok, Esq.
Florida Bar No. 555851

EXHIBIT LIST

Exhibit 1: EEOC Charge of Discrimination
Exhibit 2: EEOC Notice of Right to Sue